Gene S. JACOBSEN, Plaintiff–
Appellant and Cross–
Appellee,

v.

DESERET BOOK COMPANY, a Utah
corporation; Dean Hughes, Defen-
dants–Appellees and Cross–Appel-
lants.

Nos. 01–4027, 01–4036.

United States Court of Appeals,
Tenth Circuit.

April 19, 2002.

Brent O. Hatch (Mark R. Clements with him on the briefs) of Hatch, James & Dodge, Salt Lake City, UT, for Plaintiff–Appellant and Cross–Appellee.

Mary Anne Q. Wood (Kathryn O. Balmforth of Wood Crapo LLC with her on the briefs for Defendant–Appellee and Cross–Appellant Deseret Book Company, and Kent B. Linebaugh of Jones, Waldo, Holbrook & McDonough with her on the briefs for Defendant–Appellee and Cross–Appellant Dean Hughes) of Wood Crapo LLC, Salt Lake City, UT, for Defendants–Appellees and Cross–Appellants.

Before KELLY, Circuit Judge, BRORBY, Senior Circuit Judge, and MURPHY, Circuit Judge.

BRORBY, Senior Circuit Judge.

## I. Introduction

Dr. Gene S. Jacobsen was a prisoner of war in the Philippines and Japan during World War II. After returning from military service, Dr. Jacobsen wrote his personal memoir entitled *Who Refused to Die*. In gripping detail, *Who Refused to Die* recounts Dr. Jacobsen's survival of the Bataan Death March and subsequent years of imprisonment and torture in various work camps.

In 1997, Deseret Book Company ("Deseret Book") published the first of a five-volume series written by Dr. Dean Hughes entitled *Children of the Promise*.[1] The series is a fictional work written primarily for members of the Church of Jesus Christ of Latter-day Saints. It portrays a Latter-day Saint family's life during World War II. The story of Wally Thomas, one of the family's sons, closely follows Dr. Jacobsen's experiences as related in *Who Refused to Die*.

In 1999, Dr. Jacobsen filed a complaint against Dr. Hughes and Deseret Book seeking an injunction and damages for copyright infringement under 17 U.S.C. §§ 106 and 501. After nearly a year of discovery, Deseret Book filed a motion asking the district court to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and award Deseret Book attorney fees. Dr. Hughes joined Deseret Book's Rule 12(b)(6) motion and filed a motion for summary judgment on several affirmative defenses. The district court granted the

---

1. The individual volumes are titled, beginning with the first, *Rumors of War; Since You Went Away; Far From Home; When We Meet Again;* and *As Long as I Have You.*

Rule 12(b)(6) motion, granted summary judgment on the affirmative defense of laches, and denied the request for attorney fees.

On appeal, Dr. Jacobsen challenges the district court's dismissal of his complaint pursuant to Fed.R.Civ.P. 12(b)(6) as well as the court's granting summary judgment on the affirmative defense of laches. Dr. Jacobsen also appeals the district court's refusal to strike defendants' expert reports or allow Dr. Jacobsen additional time to designate expert witnesses. Dr. Hughes and Deseret Book filed a cross-appeal seeking attorney fees. We exercise jurisdiction under 28 U.S.C. § 1291 and reverse the 12(b)(6) dismissal, the grant of summary judgment on laches, and the refusal to strike the expert reports. Both Dr. Jacobsen's request for additional time to designate experts and Dr. Hughes' and Deseret Book's request for attorney fees are moot.

## II. Motion to Dismiss

 Dr. Jacobsen argues the district court erred in granting Dr. Hughes' and Deseret Books' motion to dismiss.[2] "We review a dismissal under Rule 12(b)(6) de novo." *Wark v. United States*, 269 F.3d 1185, 1190 (10th Cir.2001). Our " 'function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.' " *Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1236 (10th Cir.1999) (quoting *Miller v. Glanz,* 948 F.2d 1562, 1565 (10th Cir.1991)).

 In addition to the complaint, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity. *See GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir.1997). Because Dr. Jacobsen's complaint referred to *Who Refused to Die* and the *Children of the Promise* series, and all the parties invited the district court to consider these works, the district court properly considered the work in ruling on the 12(b)(6) motion.[3] *See Lewis v. Kroger Co.,* 109 F.Supp. 484, at 486 (S.D.W.Va.1952) (considering original and allegedly copied material in ruling on 12(b)(6) motion). When a district court considers the original work and the alleg-

---

**2.** Normally a motion to dismiss for failure to state a claim upon which relief can be granted should be made prior to filing the answer or in the answer itself. Fed.R.Civ.P. 12(b)(6). If the defendant makes the motion after filing the answer, the motion should generally be treated as a motion for judgment on the pleadings. Fed.R.Civ.P. 12(c), (h)(2); *Lowe v. Town of Fairland, Okla.,* 143 F.3d 1378, 1381 n. 5 (10th Cir.1998); *Republic Steel Corp. v. Pennsylvania Eng'g Corp.,* 785 F.2d 174, 182 (7th Cir.1986). In keeping with the parties' designation, we refer to the motion as a 12(b)(6) motion to dismiss. We use the same standard when evaluating 12(b)(6) and 12(c) motions. *See Atlantic Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1160 (10th Cir.2000) ("A motion for judgment on the pleading under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6).").

Therefore, in this case, our decision would be the same whether considered as a 12(b)(6) motion or a 12(c) motion.

**3.** Although Dr. Jacobsen told the district court it could consider the *Children of the Promise* books, at oral argument on appeal Dr. Jacobsen argued we should consider only the complaint. We need not consider Dr. Jacobsen's new-found objection to reviewing the *Children of the Promise* series. *See John Zink Co. v. Zink,* 241 F.3d 1256, 1259 (10th Cir.2001) (quoting *United States v. Edward J.,* 224 F.3d 1216, 1222 (10th Cir.2000)) (" 'The invited error doctrine prevents a party from inducing action by a court and later seeking reversal on the ground that the requested action was error.' ").

edly copyrighted work in deciding a 12(b)(6) motion, the legal effect of the works are determined by the works themselves rather than by allegations in the complaint. *See Droppleman v. Horsley,* 372 F.2d 249, 250 (10th Cir.1967) (holding the legal effect of an incorporated document considered on a motion to dismiss " 'is to be determined by [the document's] terms rather than by the allegations of the pleader' " in the complaint) (quoting *Zeligson v. Hartman–Blair, Inc.,* 126 F.2d 595, 597 (10th Cir.1942)).

■ We cannot affirm the dismissal for failure to state a claim unless, after considering the complaint, *Who Refused to Die,* and the *Children of the Promise* series[4] in the light most favorable to Dr. Jacobsen, it appears beyond doubt Dr. Jacobsen can prove no set of facts in support of his claim that would entitle him to relief. *Stidham v. Peace Officer Standards & Training,* 265 F.3d 1144, 1149 (10th Cir.2001). To establish copyright infringement, Dr. Jacobsen must prove "(1) ownership of a valid copyright and (2) 'copying of constituent elements of the work that are original.' " *TransWestern Publ'g Co., v. Multimedia Mktg. Assocs.,* 133 F.3d 773, 775 (10th Cir.1998) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)). The complaint clearly alleges Dr. Jacobsen has a federally registered copyright for *Who Refused to Die.* Thus, we need only determine whether the complaint and incorporated documents are sufficient to allege Dr. Hughes and Deseret Book copied *Who Refused to Die.*

■ Whether Dr. Hughes and Deseret Book copied *Who Refused to Die* "involves two distinct inquiries: first, whether [Dr. Hughes], as a factual matter, copied [Dr. Jacobsen's] work, and second, whether, as a mixed issue of fact and law, those elements that were copied were protected." *Country Kids 'N City Slicks, Inc. v. Sheen,* 77 F.3d 1280, 1284 (10th Cir.1996). After reviewing the complaint and incorporated documents, we are satisfied Dr. Jacobsen could present evidence showing Dr. Hughes copied many of the experiences Dr. Jacobsen recorded in *Who Refused to Die.* The difficulty in this case arises in determining whether Dr. Hughes copied only unprotected facts or instead impermissibly copied Dr. Jacobsen's original expression.

■ It is well settled "no author may copyright facts or ideas." *Harper & Row, Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 547, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Thus, the copyright of a non-fiction work protects only "those aspects of the work—termed 'expression'—that display the stamp of the author's originality." *Id. See also Feist,* 499 U.S. at 348, 111 S.Ct. 1282 ("[C]opyright protection may extend only to those components of a work that are original to the author."). "[A] copyright does not prevent subsequent users from copying from a prior author's work those constituent elements that are not original—for example . . . facts, or materials in the public domain—as long as such use does not unfairly appropriate the author's original contributions." *Harper & Row,* 471 U.S. at 548, 105 S.Ct. 2218 (quotation marks and citations omitted).

■ In order to prove copying of legally protectible material, a plaintiff must typically show substantial similarity between legally protectible elements of the

---

**4.** Despite the importance of the *Children of the Promise* series to this appeal, none of the parties designated the series as part of the record on appeal. We, therefore, have *sua sponte* supplemented the record with the five-volume *Children of the Promise* series. *See* 10th Cir. R. 10.3(B); *Cox v. United States,* 881 F.2d 893, 894 n. 1 (10th Cir.1989).

original work and the allegedly infringing work. *Country Kids 'N City Slicks*, 77 F.3d at 1284. "This is primarily a qualitative·rather than a purely quantitative analysis, and must be performed on a case-by-case basis." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 839 (10 Cir.1993) (citation and footnote omitted).[5] To decide whether two works are substantially similar we ask " 'whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value.' " *Country Kids 'N City Slicks*, 77 F.3d at 1288 (quoting *Atari, Inc. v. North Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 614 (7th Cir.1982)). Determining whether there is substantial similarity in cases involving fact-based works is particularly difficult.

> [T]he measure of how substantial a "substantial similarity" must be may vary according· to circumstances. For many copyrights represent significant creative effort, and are therefore reasonably robust, whereas others reflect only scant creativity; the Supreme Court labels the latter "thin." It would seem to follow analytically that more similarity is required when less protectible matter is at issue. Thus, if substantial similarity is the normal measure required to demonstrate infringement, "supersubstantial" similarity must pertain when dealing with "thin" works.

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.03[A], at 13–28 (2000) (hereinafter *Nimmer*). *See also TransWestern*, 133 F.3d at 776 (relying on Nimmer's "supersubstantial" similarity analysis). Because "[n]o easy rule of thumb can be stated as to the quantum of fragmented literal similarity permitted without crossing the line of substantial similarity," whether works are substantially similar is "a classic jury question." 4 *Nimmer, supra*, § 13.03[A][2], at 13–46 and n. 96 (2001). *Cf. King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir.1999) (holding the trier of fact should normally make the determination of similarity in a trademark infringement case, but the court can monitor the "outer limits" of similarity if "reasonable minds" could not differ on the question). In applying these principles to Dr. Jacobsen's appeal, we first distinguish the supersubstantial similarity analysis relied on by the district court. Then, we compare *Who Refused to Die* and the *Chil-*

---

**5.** In determining whether a defendant has copied legally protectible material, we have sometimes found it useful to use an abstraction-filtration-comparison analysis. *See Country Kids 'N City Slicks*, 77 F.3d at 1284–85; *Gates Rubber*, 9 F.3d at 834. We have described this analysis as follows:

> At the abstraction step, we separate the ideas (and basic utilitarian functions), which are not protectable, from the particular expression of the work. Then, we filter out the nonprotectable components of the product from the original expression. Finally, we compare the remaining protected elements to the allegedly copied work to determine if the two works are substantially similar.

*Country Kids 'N City Slicks*, 77 F.3d at 1284–85. While abstraction-filtration-comparison analysis is useful in a variety of copyright cases, not every case requires extensive analysis. *Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1372 (10th Cir.1997). "Rather, 'the appropriate test to be applied and the order in which its various components are to be applied ... may vary depending upon the claims involved, the procedural posture of the suit, and the nature of the [works] at issue.' " *Id.* (quoting *Gates Rubber*, 9 F.3d at 834 n. 12). Regardless .of our method of distilling the protectible aspects of *Who Refused to Die*, the ultimate issue is whether the *Children of the Promise* series is substantially similar to protectible aspects of *Who Refused to Die*. *See Gates Rubber*, 9 F.3d at 839.

*dren of the Promise* series addressing precedent relied upon by Dr. Hughes and Deseret Book.

In ruling on the motion to dismiss, the district court found "[Dr.] Hughes copied some 'facts' from [Dr.] Jacobsen's memoir, but not significant original expression." Relying on *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) and *TransWestern Publishing Co. v. Multimedia Marketing Associates*, 133 F.3d 773 (10th Cir.1998), two cases involving copied telephone directories, the district court applied a supersubstantial similarity test rather than the substantial similarity requirement traditionally applied in copyright infringement cases. The court noted several differences between *Who Refused to Die* and the character Wally in the *Children of the Promise Series.*

> Much of the *Children of the Promise* series deals with spiritual matters and a[sic] most of the volumes are devoted to Wally's large and extended family. [Dr.] Jacobson's [sic] memoir, on the other hand, does not emphasize spiritual matters except in passing.... Further, the memoir deals only with [Dr.] Jacobsen's experiences in a limited matter and does not expand much over time and geography as do [Dr.] Hughes' novels. It is clear to this court that Wally is not Gene Jacobsen.

Consequently, the district court concluded under "the ... supersubstantial similarity test it is clear that [Dr.] Hughes did not copy any protectable aspects of the memoir."

We disagree. First, we conclude the district court gave undue weight to language in *Feist* and *TransWestern* incor-rectly applying a "supersubstantial similarity test" in evaluating whether Dr. Hughes and Deseret Book copied protected elements of *Who Refused to Die*. In *Feist*, the Supreme Court held "the copyright in a factual compilation is thin." *Feist,* 499 U.S. at 349, 111 S.Ct. 1282. In *TransWestern*, we stated "if substantial similarity is the normal measure required to demonstrate infringement, 'supersubstantial' similarity must pertain when dealing with thin works." *TransWestern,* 133 F.3d at 776 (quoting 4 *Nimmer, supra,* § 13.03[A], at 13.28 (1997)). The district court seized this language and applied what it called "the Tenth Circuit supersubstantial similarity test." We do not read *TransWestern* so broadly as to require us to apply a supersubstantial similarity test to all fact-based works. Rather *TransWestern* merely reaffirmed "the measure of how substantial a 'substantial similarity' must be may vary according to circumstances." 4 *Nimmer, supra,* § 13.03[A], at 13–28 (2000). Because fact-based works differ "as to the relative proportion of fact and fancy," *Harper & Row,* 471 U.S. at 563, 105 S.Ct. 2218, the quantum of similarity required to establish infringement differs in each case. Merely applying a supersubstantial similarity test to all fact-based works would ignore the differences between "sparsely embellished maps and directories" and "elegantly written biography." *Id.* In short, *Who Refused to Die* involves more creative effort and original expression than the telephone directories at issue in *Feist* and *TransWestern.* Therefore, Dr. Jacobsen could prove substantial similarity with less similarity than we would require if the allegedly infringed work were a telephone directory.[6]

---

**6.** Dr. Hughes and Deseret Book do not agree *Who Refused to Die* is entitled to greater protection than a telephone directory. They point to a sentence in *Harper & Row:* "The extent to which one must permit expressive language to be copied, in order to assure dissemination of the underlying facts, will thus vary from case to case." *Harper & Row,*

■ Second, although the district court's catalogue of differences between *Who Refused to Die* and the *Children of the Promise* series is accurate, it is largely irrelevant. We realize the five-volume *Children of the Promise* series contains much material not taken from the single-volume *Who Refused to Die*. However, "a taking may not be excused merely because it is insubstantial with respect to the *infringing* work. As Judge Learned Hand cogently remarked, 'no plagiarist can excuse the wrong by showing how much of his work he did not pirate.'" *Harper & Row*, 471 U.S. at 565, 105 S.Ct. 2218 (quoting *Sheldon v. Metro–Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir.1936)). "The question in each case is whether the similarity relates to matter that constitutes a substantial portion of plaintiff's work—not whether such material constitutes a substantial portion of defendant's work." 4 *Nimmer, supra*, § 13.03[A][2], at 13–46 (2001). Thus we are not concerned with whether the copied material is a substantial part of the *Children of the Promise* series. Rather, we must consider whether Dr. Hughes and Deseret Book copied a substantial portion of *Who Refused to Die*.

■ With these clarifications in mind, we next compare *Who Refused to Die* and the *Children of the Promise* series. It is clear Dr. Hughes copied much of the plot line for Wally Thomas from *Who Refused to Die*. As we need not weigh the evidence, we make no attempt to compile an exhaustive list of protectible material a jury could find to have been copied. Suffice it to say the similarity goes beyond the bare facts that both works describe a World War II Army Air Corps Supply Sergeant who was captured by the Japanese, forced to march across the Bataan Peninsula, and imprisoned in various work camps. Both works tell how Japanese planes bombed an air field just as a soldier was delivering cigars.[7] Both describe a Japanese officer's

471 U.S. at 563, 105 S.Ct. 2218 (quotation marks and citation omitted). Dr. Hughes and Deseret Book argue "[t]he point of this quotation, then, is that even highly creative expression might receive *less* protection when it is used to describe facts than it would in a fictional work." (Emphasis in original.) We agree *Who Refused to Die* should receive less protection than a purely fictional novel. However, we cannot see how this proposition leads to the conclusion *Who Refused to Die* should be treated as a telephone directory. We believe the quotation from *Harper & Row* merely reinforces the view substantial similarity should be decided on a case-by-case basis.

7. Dr. Jacobsen's memoir states:

Not far from where I stood he stopped the truck and got out. He took from the seat of the truck a box of cigars that he had scrounged from somewhere. He opened the box and placed it on the truck's hood. Then, he dipped both hands into the box and came out with a double handful of cigars. Coming towards the trees, he began shouting, "Cigars? Cigars! Does anyone want a cigar?"

Laughing at his antics, I turned around to see if he had any takers. No one was in sight.

Instinctively I turned towards the small tower which had been constructed. Sure enough, the red flag was whipping excitedly in the breeze as if its very movement would be sufficient to alert us of approaching enemy planes.

Almost simultaneously I heard the shrill, chilling whistle of the bombs from the Japanese planes overhead as they made their treacherous descent towards Clark Field.

Gene S. Jacobsen, *Who Refused to Die* 20 (Jan.1, 1995) (unpublished manuscript). Dr. Hughes wrote:

He braked and then bounced out of the truck. He had a box in his hand, which he slapped onto the hood of the truck. Then he reached in and pulled out a double handful of cigars. "Cigars! Cigars!" he yelled above the drone of the engines.

Wally wondered where Sandy had managed to scrounge a box of cigars, and he looked around to see who wanted one—but saw no one at all. Instantly, Wally guessed what was happening. He spun to look at the lookout tower the men had built. A red flag was waving in the breeze—the sign for an air attack. At the same moment, Wally heard the whistle of dropping bombs.

anguish after he discovered an American prisoner of war serving on a work detail accidentally pulled up baby carrot plants.[8] Both recount the "humiliation" the protagonist felt when guards assigned him to the "honey detail" and required him to empty their outhouses.[9] In some instances, the copying goes beyond close paraphrasing and reproduces Dr. Jacobsen's words exactly. Consider the following example. The first paragraph is Dr. Jacobsen's description of his journey to unite with American troops after the war ended. The second is Dr. Hughes' description of the same event in the fictional life of Wally Thomas.

> Approaching the sailors the second time, one of the fellows drove his souvenir sword into the deck of the ship and said somewhat fiercely, *"Listen you guys! General MacArthur said that we had the authority to use any means of transportation necessary to get out of Japan, and this boat is necessary for us to reach American troops. We are going to get across this bay with you or without you. If you want to take us across and get paid for your troubles, fine. If you don't, get off the ship, and we'll take ourselves across!"*

Jacobsen, *supra*, at 193–94 (emphasis added).

> This time it was Potts who walked on ahead. He was carrying a souvenir sword of his own. When he stepped onto the deck, he shouted, "We need to talk," and he slammed his sword into the deck, sticking it up by its point.... *"Listen* to me *you guys,"* Potts went on. *"General* Douglas *MacArthur* has authorized us *to use any means* we find *necessary* to reach American troops. *We* 're *going to* cross *this bay with you or without you. If you want to take us across and get paid for your troubles, fine. If you don't, get off the ship, and we'll take* her across ourselves."

Dean Hughes, 4 *Children of the Promise: When We Meet Again* 427–28 (1999) (emphasis added).

Dr. Hughes and Deseret Book do not believe these and other passages reveal copying. They argue "[Dr.] Hughes never copied [*Who Refused to Die*] verbatim. He retold the factual events in his own

---

Dean Hughes, 1 *Children of the Promise: Rumors of War* 436 (1997).

8. *Who Refused to Die* reads:
 > The Jap, seeing what had happened, dropped to his knees and picked up a handful of the weeds and carrots. Though he couldn't speak a word of English, it was easy, from the expression on his face and from his voice, to tell what he was thinking and saying as he separated the carrots from the weeds. I know he must have been quietly sobbing, "My poor little carrots, my poor little carrots."

 Jacobsen, *supra*, at 133. *Children of the Promise* reads:
 > I thought for a minute the Jap was going to cry. He bent down and showed Frank which ones were carrots and which were weeds. He hardly knew a word of English, but he kept showing ol' Frank and jabbering away. It was almost like he was saying,

 > "Oh, son, look what you've done to my lovely little carrots."

 Dean Hughes, 2 *Children of the Promise: Since You Went Away* 188 (1997).

9. *Who Refused to Die* at 130.
 > The assignment to be avoided if at all possible, was the "honey" detail that daily cleaned the Japanese toilets and carried the contents to the farm where it was spread around the plants. The work was bearable, but the humiliation was almost too great.

 *Children of the Promise*, Vol. 2 at 186.
 > Each morning Wally would receive a work assignment.... [W]orst of all was the "honey" detail. The work was not terribly strenuous, but the humiliation was almost more than he could stand. A work crew would carry the contents of the outhouses to the fields, and then they would spread the human waste around the plants in the garden.

words and style, and he placed them in a fictional context of his own creation." We disagree. Dr. Hughes and Deseret Book never directly address why the preceding example and others do not amount to verbatim copying. Instead, they cite several cases suggesting some verbatim copying is permissible. *See Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir.1989); *Suid v. Newsweek Magazine*, 503 F.Supp. 146, 148 (D.D.C.1980); *Alexander v. Haley*, 460 F.Supp. 40, 46 (S.D.N.Y.1978); *Norman v. Columbia Broad. Sys., Inc.*, 333 F.Supp. 788, 797 (S.D.N.Y.1971). We conclude these cases are inapplicable to the case before us.

*Narell, Alexander*, and *Norman* are distinguishable because those cases involved verbatim copying of only a few words and phrases. *See Narell*, 872 F.2d at 911; *Alexander*, 460 F.Supp. at 46; *Norman*, 333 F.Supp. at 797. For example, in *Narell* the court held there was no copyright infringement when the verbatim copying amounted to a few descriptive phrases like "cow path" and "hordes of gold seekers." *Narell*, 872 F.2d at 911. Indeed, the above cited example from the *Children of the Promise* series reveals Dr. Hughes and Deseret Book arguably copied more than a few words and phrases.

 *Suid* is also inapplicable. In *Suid*, the court held "[t]he author of a factual work may not ... claim copyright in statements made by others and reported in the work since the author may not claim originality as to those statements." *Suid*, 503 F.Supp. at 148. We acknowledge the words contained in both paragraphs of the above-cited example were enclosed in quotation marks. We agree quotations may be freely copied if the quotation is recorded contemporaneously or taken directly from a written source as in *Suid*. Dr. Jacobsen did not, however, contemporaneously record the quotations or copy them from a written source. For this reason, a trier of fact might conclude the material in quotation marks in *Who Refused to Die* was original expression rather than the actual words used. Dr. Jacobsen may have enclosed the material in quotations merely to allow him to speak in the voice of a third party while recording his story. Because the issue of whether the dialogue in Who Refused to Die is original expression or fact turns, at least in part, on additional evidence to be presented at trial, the question should be determined by the trier of fact rather than the court.

The Supreme Court's decision in *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), is particularly instructive on the issue of verbatim copying. In *Harper & Row*, the Supreme Court upheld a district court's finding of copyright infringement. *Id.* at 541–42, 105 S.Ct. 2218. Harper & Row owned the copyright to President Ford's unpublished memoir. *Id.* at 542, 105 S.Ct. 2218. Prior to publication of the memoir, a magazine obtained a copy of the memoir and published an article including verbatim quotes from the memoir. *Id.* at 542–43, 105 S.Ct. 2218. The Supreme Court held even though President Ford's memoir was a factual work, the magazine's verbatim copying of the memoir appropriated original expression and amounted to copyright infringement. *Id.* at 548–49, 105 S.Ct. 2218. Likewise, when viewed in the light most favorable to Dr. Jacobsen, the *Children of the Promise* series contains passages arguably copied verbatim from *Who Refused to Die*. Because *Harper & Row* establishes verbatim copying from a memoir appropriates the author's original expression, we could only uphold the district court's dismissal if the copying were so minor as to be beyond the outer limits of substantial similarity. We conclude the copying is not so minor as to

remove the substantial similarity decision from the domain of the trier of fact.

Because we hold the *Children of the Promise* series contains enough material for a trier of fact to find verbatim copying, we need not address whether close paraphrasing of an historical work is sufficient to establish a copyright violation.[10] *See id.* at 548, 105 S.Ct. 2218. We acknowledge the Supreme Court has not settled this issue. However, the Second Circuit has held close paraphrasing of unpublished letter in an historical biography violated copyright law. *Salinger v. Random House, Inc.,* 811 F.2d 90, 93, 96–97 (2d Cir.1987). Nothing in our opinion would preclude the Tenth Circuit from adopting the Second Circuit's approach in the future.

In conclusion, when viewing the complaint, the *Children of the Promise* series, and *Who Refused to Die* in the light most favorable to Dr. Jacobsen, we conclude Dr. Jacobsen could prove a set of facts entitling him to relief. Portions of the *Children of the Promise* series could be seen as verbatim copying of Dr. Jacobsen's original expression. These instances are numerous enough to allow a jury to determine whether the works are substantially similar. We, therefore, reverse the district court's ruling on the 12(b)(6) motion.

## III. Laches

Next, we address whether the district court correctly granted summary judgment after determining Dr. Jacobsen's claims were barred by laches. Because there are disputes as to material facts, we hold the district court erred in granting summary judgment on the laches issue.

■ As an initial matter, we must determine the appropriate standard for reviewing the district court's decision. Dr. Jacobsen argues we should apply a *de novo* standard. In contrast, Dr. Hughes advocates an abuse of discretion standard. We have used the abuse of discretion standard to review a district court's application of the laches defense after a bench trial. *Mile High Indus. v. Cohen,* 222 F.3d 845, 852, 857 (10th Cir.2000); *Jicarilla Apache Tribe v. Andrus,* 687 F.2d 1324, 1328, 1337 (10th Cir.1982). However, when a district court applies the laches doctrine to dismiss a claim on summary judgment, we review the district court's decision de novo. *Hutchinson v. Pfeil,* 105 F.3d 562, 564 (10th Cir.), *cert. denied,* 522 U.S. 914, 118 S.Ct. 298, 139 L.Ed.2d 230 (1997). In keeping with Tenth Circuit precedent, we apply de novo review in this case.[11]

10. For this reason we do not undertake extensive analysis of two cases cited by Dr. Hughes and Deseret Book. In their brief, Dr. Hughes and Deseret Book direct us to *Walker v. Time Life Films, Inc.,* 615 F.Supp. 430 (S.D.N.Y. 1985) and *Polsby v. St. Martin's Press, Inc.,* No. 97 Civ. 690(MBM), 1999 WL 225536 (S.D.N.Y. Apr.19, 1999) (unpublished decision). Neither of these cases involved verbatim copying. *Walker,* 615 F.Supp. at 436–37; *Polsby,* 1999 WL 225536, at *4. Similarly, we need not analyze portions of *Narell* discussing paraphrasing to reach our decision in this case.

11. Some circuits use a bifurcated standard to review a district court's grant of summary judgment on a laches defense. For example,

the Seventh Circuit held "while our review of the record is *de novo* in determining whether there are any disputed issues of material fact, our review of whether the district court properly applied the doctrine of laches is under an abuse of discretion standard." *Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 819 (7th Cir.1999). *See also Wanlass v. General Elec. Co.,* 148 F.3d 1334, 1337 (Fed.Cir.1998); *National Ass'n of Gov't Employees v. City Pub. Serv. Bd.,* 40 F.3d 698, 707–08 (5th Cir.1994). Although we do not adopt this approach, we note our decision would be the same under this standard. Our de novo review of the record convinces us there are genuine issues of material fact. Consequently, we would not need to undertake the abuse of discretion analysis.

"Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Hutchinson*, 105 F.3d at 564. "In determining whether the defendant is entitled to summary judgment, we view all facts and reasonable inferences therefrom in the light most favorable to the plaintiff." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

"In order to prove the affirmative defense of laches, the defendant must demonstrate that there has been an unreasonable delay in asserting the claim and that the defendant was materially prejudiced by that delay." *Hutchinson*, 105 F.3d at 564. "Generally speaking, the relevant delay is the period from when the plaintiff knew (or should have known) of the allegedly infringing conduct, until the initiation of the lawsuit in which the defendant seeks to counterpoise the laches defense." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 952 (9th Cir.2001).

In granting Dr. Hughes' summary judgment motion, the district court noted "the facts in this matter are highly disputed; however the facts regarding laches . . . are to be determined by the court." The district court then found "[Dr.] Jacobsen had knowledge of the material used by [Dr.] Hughes as early as 1994 and no later than 1996." In addition, the court found Dr. Jacobsen "had ample opportunity to let [Dr.] Hughes know of his disapproval as early 1996" but instead delayed in bringing his claim until 1999 causing "extreme prejudice to [Dr.] Hughes." Consequently, the district court concluded Dr. Jacobsen's claims were barred by laches.

We disagree with the district court's conclusion summary judgment was appropriate on the issue of laches. Although a district court can make factual findings related to laches after a bench trial, *Mile High Indus.*, 222 F.3d at 857, the court should not make factual findings when addressing a summary judgment motion based on laches, *Hutchinson*, 105 F.3d at 564. Rather than deferring to district court's finding of fact, we view the record in the light most favorable to Dr. Jacobsen. *Id.* When viewing the record in this light, we find disputes of material facts. If Dr. Jacobsen's version of the facts are accepted, Dr. Hughes is not entitled to summary judgment on the laches defense.

Both parties agree Dr. Jacobsen and Dr. Hughes first met in 1994. As the district court found, "what happened at the meeting and thereafter is heavily disputed by the parties." In his deposition, Dr. Jacobsen testified Dr. Hughes was interested in gathering background information on the war in the Pacific for use in writing a series of fictional books. Because he thought it would be useful as background information, Dr. Jacobsen gave Dr. Hughes a copy of *Who Refused to Die*. If this is accepted as true, we cannot see how this meeting could have alerted Dr. Jacobsen to the possibility Dr. Hughes would use *Who Refused to Die* in such a way as to raise copyright concerns.

Dr. Jacobsen's next contact with Dr. Hughes occurred in March 1996. The parties agree Dr. Hughes mailed Dr. Jacobsen a copy of a portion of the manuscript for the first book in *The Children of the Promise* series. The exact content of the material Dr. Hughes sent is disputed. Dr. Hughes contends the material should have put Dr. Jacobsen on notice of the nature of his use of *Who Refused to Die*. Dr. Jacobsen argues he did not receive all of the material Dr. Hughes claims to have sent. Dr. Jacobsen testified the materials did not include excerpts containing stories from *Who Refused to Die*. Although Dr. Jacobsen admitted he only "skimmed" the

**950**

material, he testified he read the material carefully enough to identify any familiar stories. Again, if Dr. Jacobsen's version of the facts are accepted, we cannot conclude Dr. Jacobsen knew or should have known about potential copyright claims in 1996.

■ Dr. Hughes argues "even if we fully credit [Dr.] Jacobsen's testimony that he did not know exactly *how* [*Who Refused to Die* ] was being used, he indisputably *should* have known, if that issue was of any concern to him at all." (Emphasis in original.) He suggests Dr. Jacobsen should have asked questions to ensure Dr. Hughes would not violate Dr. Jacobsen's copyright. While Dr. Jacobsen was expected to "exercise reasonable diligence in protecting his rights," *Jicarilla Apache Tribe,* 687 F.2d at 1338, laches should not be applied if Dr. Jacobsen was "justifiably ignorant of the facts creating his … cause of action," *Lawson v. Haynes,* 170 F.2d 741, 744 (10th Cir.1948). We cannot conclude Dr. Jacobsen had a responsibility to inquire into Dr. Hughes' use of *Who Refused to Die* absent any reason to suspect Dr. Hughes was using *Who Refused to Die* in an inappropriate way. *See West v. American Tel. & Tel. Co.,* 311 U.S. 223, 240–41, 61 S.Ct. 179, 85 L.Ed. 139 (1940) (upholding a district court's rejection of laches defense even though the plaintiff did not conduct an inquiry to reveal unlawful conduct because there was no evidence suggesting the plaintiff had reason for suspicion).[12]

■ Next, Dr. Hughes argues Dr. Jacobsen should have discovered the na-

ture of Dr. Hughes' use of *Who Refused to Die* when the first volume of the *Children of the Promise* series was published in March 1997. Because the district court relied on its factual determination that Dr. Jacobsen should have known about Dr. Hughes' use of *Who Refused to Die* by 1996, the court did not consider whether laches would apply if the publication of the first volume was Dr. Jacobsen's first opportunity to discover his claims. We consider this argument because we can affirm for any reason supported by the record but not relied on by the district court. *Hayes v. Whitman,* 264 F.3d 1017, 1025 (10th Cir.2001). Nevertheless, we conclude Dr. Hughes' argument is without merit.

■ Even if we assume the publication of the first volume of the *Children of the Promise* series should have immediately alerted Dr. Jacobsen to his potential copyright claims, we cannot conclude Dr. Jacobsen's claims are barred by laches. Dr. Jacobsen filed suit against Dr. Hughes and Deseret Book within three years of the publication of the first volume of the *Children of the Promise* series. Rather than deciding copyright cases on the issue of laches, courts should generally defer to the three-year statute of limitations, 17 U.S.C. § 507(b), provided by the Copyright Act.

Because laches is a judicially created equitable doctrine, whereas statutes of limitations are legislative enactments, it has been observed that in deference to the doctrine of the separation of powers,

---

**12.** Dr. Hughes argues Dr. Jacobsen should have been alerted to his use of *Who Refused to Die* because "the cover letter accompanying the excerpts [sent to Dr. Jacobsen in 1996] gave strong cues as to exactly how [Dr.] Hughes was using [*Who Refused to Die* ]." We cannot conclude the letter, when viewed in the light most favorable to Dr. Jacobsen, raised the suspicion Dr. Hughes was inappro-

priately copying *Who Refused to Die.* The letter itself advised Dr. Jacobson, "[r]emember that Wally is not you." The letter also stated, "I am writing fiction and not telling *your* story." Thus, the letter could reasonably be viewed as confirming Dr. Jacobsen's belief Dr. Hughes was using *Who Refused to Die* only for background information.

the Supreme Court has been circumspect in adopting principles of equity in the context of enforcing federal statutes. Accordingly, when a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period. *United States v. Rodriguez–Aguirre,* 264 F.3d 1195, 1207–08 (10th Cir.2001) (quotation marks, citations, and alterations omitted). *See also Lyons P'ship, L.P. v. Morris Costumes, Inc.,* 243 F.3d 789, 797 (4th Cir.2001) (holding "separation of powers principles dictate that an equitable timeliness rule adopted by courts cannot bar claims that are brought within the legislatively prescribed statute of limitations" in the Copyright Act). Although "it is possible, in rare cases, that a statute of limitations can be cut short by the doctrine of laches," *Rodriguez–Aguirre,* 264 F.3d at 1208, we see no reason to supplant the statute of limitations in this case.

In arguing laches should be applied in this case, Dr. Hughes directs us to *Jackson v. Axton,* 25 F.3d 884, 888 (9th Cir. 1994), *overruled on other grounds by Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 531–32, 534, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994). Although *Jackson* held a court can apply laches in a copyright case, the facts in *Jackson* are different from the facts before us. In *Jackson,* the plaintiff knew of his claim by 1975 but did not file suit until 1991. 25 F.3d at 886, 889. Given the prolonged delay, the Ninth Circuit held laches was applicable. *Id.* at 889. *See also Danjaq,* 263 F.3d at 950, 954 (upholding a district court's application of laches to prevent a plaintiff from pursuing copyright infringement claims when plaintiff filed suit "at least twenty-one years—and more likely, thirty-six years" after having knowledge of the potential claims). In contrast, Dr. Jacobsen filed suit less than three years after publication of the first volume. It does not seem unreasonable to

allow Dr. Jacobsen three years from the time he should have known of his claim to evaluate the viability of instituting a lawsuit or pursue out-of-court remedies. *Cf. New Era Publ'ns Int'l v. Henry Holt & Co.,* 873 F.2d 576 (2d Cir.1989) (holding laches did not bar copyright holders' claims for damages when plaintiff learned of alleged infringement two years prior to bringing suit). Consequently, we defer to the Copyright Act's statute of limitations in this case.

When viewing the record in the light most favorable to Dr. Jacobsen, we conclude his delay in filing suit was reasonable. Consequently we need not address whether Dr. Hughes was materially prejudiced by the delay. We reverse the district court's ruling on the summary judgment motion and remand for further proceedings.

## IV. Discovery Issues

Next, Dr. Jacobsen argues "[t]he district court erred in denying Dr. Jacobsen's motion for additional time to file rebuttal expert reports or in the alternative to strike defendant's expert reports and designations." We conclude the district court abused its discretion in refusing to strike the expert reports.

On August 1, 2000, Dr. Hughes and Deseret Book filed the reports of four expert witnesses, Marilyn A. Lashner, Merrill R. Norman, Paul Rawlins, and Allan Wittman, pursuant to Federal Rule of Civil Procedure 26(a)(2). Dr. Hughes and Deseret Book offered the expert reports to establish the bulk of the profits from the *Children of the Promise* series are attributable to their work rather than Dr. Jacobsen's work.

Rule 26(a)(2) requires expert reports "contain a complete statement of all opinions to be expressed." Fed.R.Civ.P.

26(a)(2)(B). A party is under a continuing duty to supplement the expert report if there are additions or changes to what has been previously disclosed. Fed.R.Civ.P. 26(a)(2)(C), 26(e)(1). "A party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial . . . any . . . information not so disclosed." Fed. R.Civ.P. 37(c)(1). Arguing the expert reports were not complete, Dr. Jacobsen filed a motion asking the district court to postpone his deadline for filing rebuttal reports until after the defendant's expert reports were complete, or, in the alternative, strike the defendant's expert reports.

After a hearing on this issue, the district court denied Dr. Jacobsen's motion. It first noted Dr. Jacobsen was given the opportunity to submit his own expert reports to substantiate his claim of copyright infringement. Dr. Jacobsen did not submit expert reports because he believes he can establish copying through Dr. Hughes own admissions. The district court then reasoned Dr. Jacobsen "was fully aware that the burden regarding damages is the defendants' burden," and "should not [have been] surprised that defendants did choose to rely on expert testimony in order to prove that profits were derived from material other than the allegedly copyrighted material." Consequently, the court concluded "[Dr. Jacobsen] had the same opportunity to provide expert witnesses as [Dr. Hughes and Deseret Book] and should not now be given an opportunity to file late reports or strike defendants' timely reports." Although the district court stated it had "considered the law . . . relevant to [Dr. Jacobsen's] motion," it did not mention Rule 26(a) or Rule 37(c).

In responding to Dr. Jacobsen's appeal, Dr. Hughes and Deseret Book do not argue their expert reports were complete. Instead, they claim the expert reports could not be complete because Dr. Jacobsen never "identified the alleged infringement with specificity." Because Dr. Jacobsen never provided a paragraph-by-paragraph analysis to show which portions of the *Children of the Promise* series were copied, Dr. Hughes and Deseret Book contend the expert reports were necessarily incomplete. Their experts "could only tell what method they would use" to calculate the profits attributable to Dr. Hughes and Deseret Book when they later "issue their final opinions." In addition, Dr. Hughes and Deseret Book argue the district court was within its discretion in refusing to grant Dr. Jacobsen additional time to file rebuttal expert reports. They believe allowing Dr. Jacobsen more time to file rebuttal expert reports would have "meant abandoning the trial date," which was set for January 8, 2001. Finally, Dr. Hughes and Deseret Book assert the incomplete reports did not preclude Dr. Jacobsen from filing rebuttal reports because Dr. Jacobsen could have submitted rebuttal expert reports with "the same level of generality" as the incomplete reports.

■ Because the district court did not find the expert reports complied with Rule 26(a), and Dr. Hughes and Deseret Book acknowledge the reports were preliminary and incomplete, we turn directly to the issue of whether Rule 37(c) nevertheless allows the district court to allow the experts to testify on the basis of the incomplete reports. *See In re TMI Litigation Cases,* 922 F.Supp. 997, 1005 n. 9 (M.D.Pa.1996) (holding preliminary expert reports do not satisfy Rule 26(a)); *Smith v. State Farm Fire & Cas. Co.,* 164 F.R.D. 49, 53 (S.D.W.Va.1995) (same). Rule 37(c) permits a district court to refuse to strike expert reports and allow expert testimony even when the expert report violates Rule 26(a) if the violation is justified or harm-

less. Fed.R.Civ.P. 37(c). "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.,* 170 F.3d 985, 993 (10th Cir.1999). Nevertheless, we can hold the district court abused its discretion if the decision is based "on an erroneous conclusion of law," *Kiowa Indian Tribe v. Hoover,* 150 F.3d 1163, 1165 (10th Cir.1998), or would result in "fundamental unfairness in the trial of the case," *Orjias v. Stevenson,* 31 F.3d 995, 1005 (10th Cir.), *cert. denied,* 513 U.S. 1000, 115 S.Ct. 511, 130 L.Ed.2d 418 (1994).

 Although a district court can allow evidence violating Rule 26(a) only if the violation was justified or harmless, *Jones v. Lincoln Elec. Co.,* 188 F.3d 709, 728 (7th Cir.1999), "[a] district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness" of a Rule 26(a) violation, *Woodworker's Supply,* 170 F.3d at 993. Nevertheless, the court should consider the following factors: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Id.* We conclude the district court abused its discretion by misapplying two of these factors and not addressing the other two factors.

Initially, we note the district court did not address whether the Rule 26(a) violation was justified or harmless. With respect to the first factor, the district court opined Dr. Jacobsen should not have been surprised because experts are often used by defendants in copyright cases. This ignores the purpose of Rule 26(a) expert reports. The reports are intended not only to identify the expert witness, but

also "to set forth the substance of the direct examination." Fed.R.Civ.P. 26(a)(2) advisory committee note (1993). Such disclosure is necessary to allow the opposing party "a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." *Id.* Thus, to avoid prejudice Dr. Jacobsen needed to know the substance of the experts' testimony. After reviewing the expert reports, it appears likely the experts' testimony at trial will contain substantially more information than was presented in the expert reports. Dr. Lashner's report reveals she had reviewed *Who Refused to Die,* the first volume of the *Children of the Promise* series, and the jacket covers for volumes, two, three, and four of the series. At the time of her expert report she was "in the process of reviewing the remaining materials." Mr. Norman's report "summarize[d] the revenues, expenses and net profits associated with the *Children of the Promise* series through June 30, 2000." Mr. Rawlins' report warns his "percentages are for explanatory purposes only," and his report "is subject to amendment after additional analysis." Similarly, Mr. Whitman's report states he "expect[s] to do additional research on these issues between now and the trial and will refine these calculation." At trial, it is likely Dr. Hughes and Deseret Book will want Dr. Lashner to testify about her review of the complete series, Mr. Norman to testify about more recent revenue and expenses, and Mr. Rawlins and Mr. Whitman to testify about their refined calculations. We, therefore, cannot agree Dr. Jacobsen would not be prejudiced by the introduction of testimony not contained in the expert reports.

 The second factor we consider is whether Dr. Jacobsen could somehow cure the potential prejudice. The district court suggests Dr. Jacobsen could have prevent-

ed potential prejudice if he had filed expert reports to support his copyright infringement claim. This finding suffers the same infirmity as the district court's analysis on prejudice. Prejudice results because the expert reports did not reveal what the experts will testify to at trial. Therefore, nothing Dr. Jacobsen could have done prior to filing of the expert reports would have cured the prejudice. Dr. Hughes and Deseret Book argue Dr. Jacobsen could have filed rebuttal expert reports that were similarly general in nature. Again, this remedy would not eliminate prejudice because Dr. Jacobsen still would not know what testimony the defendants' experts would give at trial.

The district court's order does not reveal its analysis concerning the third factor. Even if the district court had made specific findings as to whether the undisclosed expert testimony would have disrupted the trial, the situation now facing the parties is somewhat different. As Dr. Hughes and Deseret Book argue, when the district court issued the order the scheduled trial date was just over a month away. Consequently, the court may have decided it would be less disruptive to allow testimony based on the incomplete reports than to allow Dr. Hughes and Deseret Book time to file complete reports. Since we are remanding this case for further proceedings, trial is no longer imminent and the district court could allow more time for discovery without disrupting a scheduled trial. *See Standard v. Union Pacific R.R. Co.*, 198 F.3d 258, 1999 WL 992973, at *3 (10th Cir. Nov.2, 1999) (unpublished opinion) (reversing a district court's discovery ruling because, after a remand, trial was not imminent).

With respect to the fourth factor, the district court did not make a finding as to whether Dr. Hughes and Deseret Book acted in bad faith. Desert Book and Dr. Hughes argue they acted in good faith. They contend their expert reports would have been more complete if Dr. Jacobsen had been more forthcoming in responding to discovery requests. Generally, a court should " 'not excuse non-compliance with Rule 26 by one party for the reason that the other party may not have fully complied' " with discovery requests. *Carney v. KMart Corp.*, 176 F.R.D. 227, 230 (S.D.W.Va.1997) (quoting *Smith*, 164 F.R.D. at 54). *See also Rambus, Inc. v. Infineon Techs. AG*, 145 F.Supp.2d 721, 734 (E.D.Va.2001). If Dr. Hughes and Deseret Book thought Dr. Jacobsen had unfairly avoided discovery their recourse was a motion to compel. Fed.R.Civ.P. 37.

Assuming, however, Dr. Hughes and Deseret Book acted in good faith, their good faith alone would not be enough to overcome the other factors. If the experts are allowed to testify on the basis of their incomplete reports, Dr. Jacobsen will be prejudiced. Absent more complete disclosure by the experts, Dr. Jacobsen's prejudice cannot be cured. As the case is no longer on the eve of trial, the district court could allow Dr. Hughes and Deseret Book time to file complete expert reports without jeopardizing the trial schedule. If Dr. Hughes and Deseret Book are allowed to file complete reports, Dr. Jacobsen would have thirty days from the time the reports were filed to file rebuttal reports. Fed. R.Civ.P. 26(a)(2)(C). For these reasons, we reverse the district court's denial of Dr. Jacobsen's motion to strike the expert reports. In accordance with this decision, we need not address Dr. Jacobsen's alternative request for additional time to file rebuttal expert reports.

## V. Attorney's Fees

Dr. Hughes and Deseret Book argue the district court should have awarded them attorney's fees because they were the pre-

vailing party in an action under the Copyright Act. In light of our holding, this argument is moot.

## VI. Conclusion

For the foregoing reasons we **REVERSE** the district court dismissal for failure to state a claim. We **REVERSE** the district court's grant of summary judgment on the laches defense. We also **REVERSE** the district court's refusal to strike four incomplete expert reports. The appeal relating to attorney's fees is moot, and we **REMAND** for further proceedings consistent with this opinion.